UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
                                                      :
MELISSA TRETOLA,                                      :
                                                      :
                              Plaintiff,              :         13 Civ. 231 (PAE)
                                                      :
                                                      :         OPINION & ORDER
              -v-                                     :
                                                      :
FIRST UNUM LIFE INSURANCE COMPANY,                    :
                                                      :   ┌─────────────────────────────┐
                              Defendant.              :   │ **USDC SDNY**               │
                                                      :   │ **DOCUMENT**                │
                                                      :   │ **ELECTRONICALLY FILED**    │
-------------------------------------------------------------------X   │ **DOC #:**_____ │
                                                          │ **DATE FILED:** 2-/6 /15    │
                                                          └─────────────────────────────┘

PAUL A. ENGELMAYER, District Judge:

        In this action, brought pursuant to the Employee Retirement Income Security Act of 1974

("ERISA"), 29 U.S.C. §§ 1001 *et seq.*, plaintiff Melissa Tretola, a former employee of Cleary

Gottlieb Steen & Hamilton LLP ("Cleary"), challenges the decision of defendant First Unum

Life Insurance Company ("First Unum") to terminate her long-term disability benefits, effective

February 14, 2012. Tretola asserts, *inter alia*, that she suffers from a variety of ailments,

including fibromyalgia, irritable bowel syndrome ("IBS"), and syringomyelia, which prevent her

from working, and that First Unum's decision to terminate her benefits was not supported by the

evidence, contrary to the terms of her disability policy, and tainted by a conflict of interest.

Tretola seeks reinstatement of her monthly disability payments, and compensation for all

payments missed since the date of termination.

        Pending before the Court are the parties' cross-motions for summary judgment. For the

reasons that follow, the Court denies the parties' cross-motions for summary judgment to the

extent they are based on Tretola's fibromyalgia and IBS. Trial is necessary to enable the Court

to reach a judgment as to whether termination of Tretola's benefits was justified based on either

or both of those conditions.  However, the Court grants First Unum's motion for summary

judgment, and denies Tretola's motion, with respect to Tretola's syringomyelia.

## I.    Background[1]

### A.    Tretola's Employment and Cleary's Long-Term Disability Insurance Policy

Tretola, a North Carolina resident born in 1970, was employed as a senior purchasing

specialist in the Manhattan office of Cleary, an international law firm, between October 2007 and

April 2009.[2]  Pl. 56.1 ¶¶ 1, 21; AR 4–5.  In that role, Tretola "oversaw the global procurement of

networking and end user hardware, software, peripherals, leased equipment, marketing materials,

office supplies, and service," and "negotiate[d] agreements with vendors."  Pl. 56.1 ¶ 22.  She

earned an annual salary of $100,000.  *Id.* ¶ 21.

---

[1] The Court's account of the facts is derived from the administrative record ("AR") and the parties' submissions in support of and in opposition to the instant motions, including Tretola's Rule 56.1 Statement of Undisputed Facts (Dkt. 68) ("Pl. 56.1"); First Unum's Rule 56.1 Statement (Dkt. 70) ("Def. 56.1"); Tretola's Response to First Unum's Rule 56.1 Statement (Dkt. 74) ("Def. 56.1 Response"); First Unum's Response to Tretola's Rule 56.1 Statement (Dkt. 75) ("Pl. 56.1 Response"); and other documents as cited.

Citations to a party's Rule 56.1 Statement incorporate by reference the documents cited therein. Where facts stated in a party's Rule 56.1 Statement are supported by testimonial or documentary evidence, and denied by a conclusory statement by the other party without citation to conflicting testimonial or documentary evidence, the Court finds such facts to be true.  *See* S.D.N.Y. Local Rule 56.1(c) ("Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party."); *id.* at 56.1(d) ("Each statement by the movant or opponent . . . controverting any statement of material fact[ ] must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c).").

[2] In Tretola's application for long-term disability benefits, she stated that April 24, 2009 was the date she was first unable to work due to her medical conditions, but that the last date she worked was August 24, 2009.  AR 97.  On January 7, 2010, Cleary terminated Tretola's employment. *Id.* at 110.  According to Cleary's employer statement submitted to First Unum, Tretola's last day worked was April 23, 2009.  *Id.*

As a Cleary employee, Tretola was covered by a group disability insurance policy (the "policy"), policy number 452278, which First Unum, licensed to issue insurance in New York, *id.* ¶ 2, issued to Cleary on January 1, 1990.  AR 163.  Tretola, as a senior purchasing specialist at Cleary, was classified as a Class 1 employee, according to the policy.  *Id.* at 165.

Under the policy, a covered employee is "disabled" because of injury or sickness if:

1. the insured cannot perform each of the material duties of [her] regular occupation; or
2. the insured, while unable to perform all of the material duties of [her] regular occupation on full-time basis, is:
   a. performing at least one of the material duties of [her] regular occupation or another occupation on a part-time or full-time basis; and
   b. earning currently at least 20% less per month than [her] indexed pre-disability earnings[3] due to that same injury or sickness.

*Id.* at 174.  Disabled Class 1 employees earn the lesser of (1) a monthly benefit of 60% of the employee's monthly earnings, or (2) the maximum monthly benefit of $22,500.  *Id.* at 165.  An employee who becomes disabled before age 60 receives benefits under the policy until the employee's 65th birthday.  *Id.* at 166.

To claim disability benefits under the policy, an employee must send a written notice of claim to First Unum within 30 days of the date the disability started, if possible.  *Id.* at 185.  The employee also must send proof of the claim to First Unum, which must cover (1) the date the disability started, (2) the cause of the disability, and (3) how serious the disability is.  *Id.*  Upon receiving proof that an employee is disabled, First Unum pays the employee a monthly benefit after the end of the "elimination period," which is the period of consecutive days of disability for which the approved employee does not receive any payable benefits from First Unum.  *Id.* at 170, 176.  (For Class 1 employees, the elimination period is 180 days under the policy.  *Id.* at

---

[3] Indexed pre-disability earnings are the earnings the covered employee received prior to the date of her disability and are adjusted for inflation.  AR 171.

166.)  If the employee receives benefits from the Social Security Administration ("SSA"), the monthly benefits the employee receives from First Unum are reduced to reflect receipt of those benefits.  *Id.* at 178.

> Under the policy, disability benefits are terminated on the earliest of:
>
> 1.  the date the insured is no longer disabled;
> 2.  the date the insured dies;
> 3.  the end of the maximum benefit period; or
> 4.  the date the insured's current earnings exceed 80% of [her] indexed pre-disability earnings.

*Id.* at 179.  For continuing disabilities, an employee must send proof of claim to First Unum within 30 days of First Unum's request for proof.  *Id.* at 185.  This proof of claim is to cover, *inter alia*, the date the disability started, the cause of the disability, and how serious the disability is.  *Id*.

First Unum also reserves the right to have an employee who claims injury or sickness be examined by a physician, other health professional, or vocational expert of First Unum's choice, and/or interviewed by a First Unum representative, as often as reasonably required.  *Id.* at 186. The policy does not confer upon First Unum the discretionary authority to determine eligibility for benefits or to interpret its terms and provisions.  Pl. 56.1 ¶ 8; Def. 56.1 ¶ 10.

**B.      Tretola's Initial Approval by First Unum for Long-Term Disability Benefits**

**1.      Overview of Tretola's Bases for Claiming Disability**

Tretola's disability claims center on three conditions: fibromyalgia, IBS, and syringomyelia.  Tretola was diagnosed with these conditions at different points of time:  In 2001, Tretola, then age 30, was diagnosed with syringomyelia, AR 2919, 3574, which "involves the abnormal collection of cerebral fluid in the spine that is often referred to as a syrinx or a cyst. Common symptoms include pain, weakness and stiffness in the back, shoulders, arms, or legs,"

*Kulakoski v. Barnhart*, 210 F. Supp. 2d 201, 203 (E.D.N.Y. 2002).  In 2008, Tretola reportedly

began having alternating constipation and diarrhea due to IBS.  AR 365.  On May 4, 2009,

Tretola's gastroenterologist, Dr. David Purow, completed an IBS diagnostic test on Tretola,

which determined that she had a 55% probability of having IBS.  *Id.* at 423.  Finally, on

September 23, 2009, Dr. Harley Cohen, a rheumatologist, diagnosed Tretola with fibromyalgia,

*id.* at 559, an ailment that leads to "widespread chronic pain," *Rodriguez v. McGraw-Hill Cos.*,

297 F. Supp. 2d 676, 678 (S.D.N.Y. 2004) (quoting Lawrence Kagen, *Fibromyalgia Report for

the Court*).  Dr. Cohen, after evaluating Tretola, found a display of "generalized tender points"

and "widespread tenderness" indicative of fibromyalgia.  AR 559.  As a result of these three

conditions, Tretola has consulted with many doctors.  Pl. 56.1 ¶¶ 47–73.

### 2.    First Unum's Initial Review of Tretola's Claim for Long-Term Disability Benefits

On December 12, 2009, Tretola submitted a long-term disability benefits claim to First

Unum, claiming that she was disabled from syringomyelia, fibromyalgia, IBS, and inflammatory

arthritis, and that she suffered from symptoms of joint pain, diarrhea, and fatigue.  AR 96–99.

Tretola noted that she "began waking up in pain in all [her] joints that progressively got worse.

[She] would have gastro attacks everytime [she] ate."  *Id.* at 96.  She further stated that she had

first been treated by a physician for these conditions on February 18, 2009.  *Id.*

Because of her conditions, Tretola stated, she could not perform the following duties

required of her in her job: "sitting, typing, reading for long lengths of time, writing, memory."

*Id.* at 97.  In submitting her disability claim, Tretola provided a list of her doctors, including Dr.

Cohen, a rheumatologist, Dr. Max Rudansky, a neurologist, Dr. Balveen Singh, a cardiologist,

Dr. Patrick Burns, a primary care physician, and Dr. Purow, a gastroenterologist.  *Id.* at 97–98.

Tretola also stated that she was taking a variety of medications, including Tramadol, Neurontin, Vicodin, Valium, Tizanidine, and Premarin. *Id.* at 97.

On December 11, 2009, Dr. Cohen submitted an attending physician statement form in support of Tretola's application for long-term disability benefits; in it, he assessed Tretola's physical abilities and limitations. *Id.* at 101. Dr. Cohen concluded that although Tretola could occasionally sit, stand, and walk, frequently perform fine finger movements, and continuously perform hand-eye coordinated movements, she was restricted from pushing, pulling, climbing, lifting, bending, stooping, prolonged sitting/standing, and carrying more than two pounds. *Id.* at 101–02.[4] Dr. Cohen stated that it was "unknown" when he expected improvement in Tretola's functional capacity, or ability to work. *Id.* at 102. Further, Dr. Cohen found that fibromyalgia was the primary diagnosis preventing Tretola from working, and that her syringomyelia was a secondary condition. *Id.* at 155.

On December 23, 2009, Cleary submitted, in connection with Tretola's disability claim, an employer statement to First Unum. *Id.* at 110–15. In it, Cleary attached the job duties and qualifications for Tretola's "senior sourcing specialist/strategic sourcing lead" position. *Id.* at 114–15. Cleary's description of Tretola's position did not identify any physical or travel requirements. *Id.* Cleary's statement also reported that Tretola's regular work schedule was seven hours per day, five days per week, for a total of 35 hours per week. *Id.* at 110.

On January 21, 2010, First Unum notified Tretola by letter that it had received her claim. *Id.* at 222. In the letter, Jo-Anne Capron, a senior disability benefits specialist at First Unum, informed Tretola that First Unum required additional information about Tretola's restrictions and

---

[4] First Unum's attending physician statement form defined "occasionally" as up to one-third of a day, "frequently" as between one-third to two-thirds of a day, and "continuously" as between two-thirds of a day to an entire day. AR 101.

limitations and the requirements of her job as senior sourcing specialist. *Id.* at 223. Capron also reiterated the terms of the Policy, including that Tretola would need to provide proof to First Unum of her continued disability and regular attendance of a physician, within 30 days of First Unum's request for proof. *Id.* Capron noted that for First Unum to assess Tretola's medical restrictions and limitations, it required a review of Tretola's medical records; Tretola and her attending physicians also had the right to request an "independent medical examination" ("IME") if opinions differed as to the degree of Tretola's medical impairment. *Id.* at 224. Capron further stated that First Unum was contacting Tretola's attending physicians for medical information, and required a detailed phone call with Tretola to discuss the policy and her condition and treatment. *Id.* at 223.[5]

On January 25, 2010, Capron conducted a phone interview with Tretola. *Id.* at 264–72. Tretola stated that she had left work in April 2009 because, at the end of 2008, she began having "stomach pains and massive diarrhea," which would disable her to the point that she would have to stay in the bathroom for hours, and thus was incapacitated. *Id.* at 265–66. According to Tretola, a specialist then diagnosed her with IBS and advised her to not eat dairy and meat. *Id.* at 265. Tretola stated that before developing IBS, she weighed 132 pounds, that by April 2009, she weighed 112 pounds, and that her current weight was 118 pounds. *Id.* at 266. Tretola also discussed her fibromyalgia. She reported that Dr. Cohen had diagnosed her with that condition, and that as a result of it, she was experiencing much pain. *Id.* at 266–67. Finally, Tretola told Capron that her doctors had advised her that she could regain work capacity in two years. *Id.* at 267.

---

[5] The Court recounts First Unum's initial review of Tretola's long-term disability claims below.

On February 25, 2010, Deborah A. Maxcy, a vocational rehabilitation consultant at First Unum, performed a vocational review to determine the physical requirements of Tretola's occupation. *Id.* at 628–31. Maxcy, through evaluating Cleary's and Tretola's descriptions of the job, concluded that Tretola's position at Cleary was most consistent with "Sourcing Specialist eDOT 162.157–119." *Id.* at 629.[6] Such a position, Maxcy stated, requires these physical demands: "[l]ight work, exerting up to 20lbs occasionally, or up to 10lbs frequently. In addition, this occupation involves frequent sitting, reaching, handling, fingering with occasional standing and walking." *Id.* at 630.[7]

On February 25, 2010 and March 1, 2010, two private investigators, on behalf of First Unum, conducted surveillance of Tretola at her home in Huntington Station, New York. *Id.* at 632, 635–46. During neither instance was Tretola observed conducting physical activity. *Id.*

On February 26, 2010, John Shannon, a First Unum field representative, conducted an in-person interview with Tretola at her home. *Id.* at 653–58. Tretola was able to walk and greet Shannon, but she sat for most of the interview. *Id*. at 653–54. Tretola's mother was present for, but did not participate in, the interview. *Id.* at 653. Tretola stated that she began to experience symptoms of fibromyalgia in April 2009 and stopped working for that reason. *Id.* at 656. Tretola also stated that although her syringomyelia caused her "severe" pain, she was able to continue working full-time, and that her IBS caused her to suffer "severe" stomach cramps. *Id.*

_____

[6] Maxcy's sources for her report included the *Dictionary of Occupational Titles* (published by the U.S. Department of Labor, Fourth Ed. revised 1991); *PAQ Services, Inc.'s Enhanced Dictionary of Occupational Titles*, data as of January 1, 2010; O*Net Online, http://online.onet.center.org; *Occupational Outlook Handbook*, 2008–09 Ed.; and VERTEK 2007 OASYS version 3.40.05. AR 631.

[7] Maxcy's report defined "occasionally" as up to one-third of a work day (zero to 2.5 hours in an eight-hour day) and "frequently" as one-third to two-thirds of a work day (2.5 to 5.5 hours a day in an eight-hour day). AR 630.

In terms of her physical limitations, Tretola noted that she was unable to drive because of the medications she was taking.  *Id.* at 653.  Tretola also reported that, because she was unable to work due to her illness, she was having trouble with her finances, and was in the process of selling her New York home to move into her parents' home in North Carolina.  *Id.*

On March 8, 2010, Tretola advised Capron via phone that she was moving to her parents' home in Mill Spring, North Carolina, on March 9, 2010.  *Id.* at 673–74.  She stated that given her disability, her parents would help take care of her.  *Id.* at 673.

On March 19, 2010, Dr. Stephen Leverett, a First Unum physician consultant, conducted the first medical review of the records First Unum had received from Tretola's treating physicians.  *Id.* at 699–707.  Tretola's records included records of the aforementioned conversations between Tretola and First Unum representatives, as well as: (1) documents Tretola submitted in an application for short-term disability benefits; (2) documents Tretola submitted in an application for New York state disability benefits; (3) documents Tretola submitted in application for benefits under the Family and Medical Leave Act ("FMLA"); and (4) medical records from her treating physicians.  Specifically, the records reflected the following, organized by condition:

*Fibromyalgia*:  On November 9, 2009, Dr. Cohen completed a short-term disability benefits form report for Tretola, stating that he had diagnosed Tretola with fibromyalgia and that she was thereby disabled.  *Id.* at 288.  He reported that he could not conclude when Tretola could return to work.  *Id.* at 289.   Dr. Rudansky also submitted a December 3, 2009 New York state disability benefits form in support of Tretola's fibromyalgia claims.  *Id.* at 301.  In the form, Dr. Rudansky stated that Tretola had suffered from, *inter alia*, pain in her neck and back, as well as

spasms and hand tremors.  *Id.* at 302.  He added that Tretola did not require an assistive device to walk, but she could only lift less than two pounds.  *Id.* at 303–04.

*IBS*:  Dr. Purow, in an August 14, 2009 report for Tretola's application for short-term disability benefits, stated that he had diagnosed Tretola with "severe" IBS and abdominal pain, but had concluded that she would be able to return to work on June 24, 2009.  *Id.* at 292.  In a report for Tretola's FMLA benefits application, Dr. Purow also stated that he had first treated Tretola on February 18, 2009, and that she could "suffer . . . debilitating abdominal pain [and] develop severe urgent diarrhea.  This at times can render her incapable of successfully carrying out nearly any job function."  *Id.* at 296.

*Syringomyelia*:  Tretola's syringomyelia condition was addressed relatively rarely in the records that First Unum had received at this point.  Instead, doctors, including Dr. Burns, Tretola's primary care physician, referred to this condition in the context of her past history.  For example, on February 17, 2006, Dr. Burns recorded Tretola's past history of syringomyelia.  *Id.* at 456.

Aside from the materials that Tretola had provided in connection with her previous applications for benefits, First Unum also received medical records from Tretola's doctors. These included medical records submitted by Dr. Burns to First Unum on January 22, 2010, regarding (1) eight office visits conducted between February 2006 and December 2009,[8] (2) correspondence between Dr. Burns and Dr. Cohen between September 2009 and December

---

[8] These occurred on February 17, 2006, April 21, 2006, September 26, 2007, April 3, 2008, September 18, 2009, October 12, 2009, November 11, 2009, and December 4, 2009.  AR 365–37, 445–56.

2009,[9] and (3) various IBS-related diagnostic tests.  Notably, in a September 23, 2009 letter to Dr. Burns, Dr. Cohen noted that Tretola "clearly displays widespread tenderness" in regards to her fibromyalgia condition.  *Id*. at 397.  On December 11, 2009, Dr. Cohen stated that Tretola "ha[d] widespread fibromyalgic tender points and severe muscle spasm around her upper trunk. She demonstrates also a trigger point at her right trapezius muscle."  *Id.* at 444.  With respect to Tretola's IBS, a May 4, 2009 IBS diagnostic test found that the "[p]attern [could not] confirm IBS," and that Tretola had a 55% probability of IBS.  *Id.* at 423.

In his review of the aforementioned medical records, Dr. Leverett primarily evaluated Tretola's fibromyalgia, syringomyelia, and IBS.  He drew these conclusions, by condition:

*Fibromyalgia*:  Dr. Leverett noted that Tretola had received contradictory treatment recommendations, with Dr. Rudansky, her neurologist, suggesting bed rest, and her attending physician encouraging her to exercise.  *Id.* at 705.  Dr. Leverett also noted that "[t]he majority of individuals are able to work and function with a diagnosis of fibromyalgia," and stated that a comprehensive pain treatment program was typically most effective in addressing symptoms associated with fibromyalgia.  *Id.*

*IBS*:  Dr. Leverett stated that this condition appeared to "wax and wane" and most recently demonstrated "clinical improvement," according to Tretola's gastroenterologist, Dr. Purow.  *Id.*  Dr. Leverett also noted that Tretola did not appear to be meeting with doctors regularly for this condition, and there was no documented weight loss or evidence of malnutrition.  *Id*.

*Syringomyelia*:  Dr. Leverett noted that it was "not clear if this condition ha[d] progressed" since Tretola had first been diagnosed with it at age 30.  *Id.*  Dr. Leverett also stated

---

[9] The correspondence occurred on September 23, 2009, October 5, 2009, November 23, 2009, and December 11, 2009.  AR 383–98, 439–44.

that there was no documentation of clinical examinations demonstrating weakness or atrophy in that area of her body; that Tretola's neurologist, Dr. Rudansky, had "somewhat cryptic" notes about Tretola's condition; and that Dr. Burns principally documented "spasms" associated with the condition. *Id.*

Dr. Leverett ultimately concluded that because of the pain that Tretola had reported, it was "reasonable" that she "would be unable to reliably sustain work." *Id.* at 706. Dr. Leverett also concluded that Tretola had a "very good" prognosis to return to functional capacity, "especially if [Tretola] participate[d] in a comprehensive pain management program." *Id.* at 707. For next steps, Dr. Leverett recommended clarifying Tretola's functional capacity by contacting her neurologist and rheumatologist, and obtaining assessments on how her syrinx impacted her functional capacity. *Id.*

### 3.     First Unum's Initial Approval of Long-Term Disability Benefits

On March 22, 2010, First Unum, in a letter, informed Tretola that it had approved her request for benefits, determining her date of disability to be April 24, 2009, with her benefits disbursement therefore beginning on October 21, 2009 (*i.e.*, after the 180-day elimination period). *Id.* at 722. Under the benefits plan, First Unum provided Tretola with $5,000 per month. *Id.* at 710. First Unum's letter also noted that it had approved of her benefits because she was "unable to sustain the capacity to perform [her] occupation due to [her] medical conditions of Syringomyelia and Fibromyalgia." *Id.* at 711. The letter further stated that First Unum would continue to review her medical records because it expected her to be able to return to her occupation with treatment. *Id.* It notified Tretola that First Unum would follow up with her in about one to two months to obtain an update on her medical condition and to discuss her ongoing treatment. *Id.*

### C.      Tretola's SSA Claim

On October 7, 2009, before filing for long-term disability benefits, Tretola applied for Social Security disability benefits.  *Id.* at 1212.  On December 10, 2009, Dr. Peter Stefanides conducted an Internal Medical Exam of Tretola for the SSA.  *Id.* at 1522.  Dr. Stefanides concluded that Tretola's syringomyelia and IBS prognoses were stable, while her fibromyalgia prognosis was guarded.  *Id.* at 1526.  He also stated that Tretola had "moderate restrictions in any prolonged walking, squatting, bending or lifting."  *Id.*

On December 17, 2009, a physical residual functional capacity assessment was conducted.  *Id.* at 1527.  This report concluded that Tretola could occasionally lift 20 pounds, frequently lift and carry 10 pounds, and stand, sit, and walk for six hours in an eight-hour day. *Id.* at 1528.  Further, although Dr. Rudansky had indicated that Tretola could lift less than two pounds, the report concluded that this opinion was not supported by any objective findings.  *Id.* at 1531.  Rather, SSA concluded that, based on the totality of the evidence, Tretola could perform light work.  It thus denied her claim.  *Id.* at 1531.

On December 30, 2010, Tretola appealed the SSA decision to an administrative law judge ("ALJ").  *Id.* at 1244.  On November 23, 2010, the ALJ, Scott Firestone, approved Tretola's Social Security disability application in a bench decision, finding that, as of April 24, 2009, she had been unable to perform her occupation.  *Id.* at 1444.  ALJ Firestone found that Tretola did not have the ability to perform sedentary work and was severely impaired by fibromyalgia and IBS; specifically, he found that Tretola could not (1) sit for six hours in an eight-hour day, (2) stand/walk for two hours in an eight-hour day, or (3) lift 10 pounds.  *Id.* at 1457.  He added that, because Tretola's medical condition was expected to improve, he recommended a continuing disability review to be started in 24 months.  *Id.* at 1458.

As noted (*see supra* I.A.), under the First Unum policy, if a disabled employee receives a Social Security disability benefit, the monthly disability benefit from First Unum is correspondingly reduced.  Pl. 56.1 ¶ 10.  On December 6, 2010, Tretola notified First Unum by telephone that her Social Security disability benefits had been approved through the appeals process.  AR 1068.  The $5,000 monthly benefit from First Unum to which Tretola was entitled was then reduced by $1,613.90, the amount of her monthly Social Security disability reduction. *Id.* at 1152.[10]

### D.      First Unum's Continuing Evaluation of Tretola and Eventual Termination

After approving Tretola's application for long-term disability benefits, First Unum continued to evaluate Tretola's condition.  To do so, First Unum deployed medical consultants, who reviewed, *inter alia*, medical records provided by Tretola's treating physicians, and undertook independent medical reviews of Tretola.  The following recounts First Unum's medical reviews of Tretola, and its eventual decision to terminate Tretola's benefits.

### 1.      Dr. Leverett's August 17, 2010 Medical Review

After Tretola's disability claims were initially approved, Dr. Leverett attempted to engage in telephone conversations with Tretola's rheumatologist, Dr. Cohen, and neurologist, Dr. Rudansky, to better understand Tretola's functional capacity and continue the assessment of Tretola's disability.  *Id.* at 739, 746.  Neither doctor responded to Dr. Leverett's requests.  *Id.* at 749, 752.

However, First Unum continued to receive records of Tretola's medical history, including (1) medical records from the Arnold-Chiari Institute, regarding Tretola's syringomyelia, (2)

---

[10] Tretola was paid $1,613.90 beginning in October 2009, but began receiving $1,696.40 in January 2010.  AR 1152.

medical records from Dr. Purow, regarding office visits between February 18, 2009 and May 10, 2010,[11] (3) medical records from Dr. Burns, regarding a May 10, 2010 visit, (4) medical records from Dr. Cohen, regarding Tretola's fibromyalgia, and (5) medical records from Dr. Rudansky, regarding her syringomyelia.  By condition, these records reflected:

*Fibromyalgia*:  First Unum received records of Tretola's visits, on February 1, 2010, March 8, 2010, and May 10, 2010, to Dr. Cohen's office for her fibromyalgia condition.  *Id.* at 891–907.  Dr. Cohen found that Tretola had "demonstrate[d] widespread fibromyalgia tender points."  *Id.* at 898.

*IBS*:  Dr. Purow, as Tretola's gastroenterologist, provided office visit records on Tretola's IBS condition.  After Tretola's initial visit with Dr. Purow on February 18, 2009 visit, Dr. Purow wrote that Tretola was "unable to eat meat or dairy" but was "able to tolerate Taco Bell somehow."  *Id.* at 811.  He also noted that Tretola had lost about 14 pounds during the past 18 months.  *Id*.  However, by July 2, 2009, Dr. Purow noted that Tretola's IBS was "doing really well."  *Id.* at 806 (emphasis in original).   After a May 10, 2010 visit, Dr. Purow stated that Tretola's IBS was "now just diet-controlled," and that "[s]he overall has been doing really well." *Id.* at 877.  Dr. Burns, Tretola's primary care physician, concurred with Dr. Purow:  In a medical record of an office visit on May 10, 2010, Dr. Burns noted that Tretola had reported "her IBS symptoms [had] improved lately."  *Id.* at 886.

*Syringomyelia*:  For Tretola's syringomyelia, the Arnold-Chiari Institute's records provided the most current diagnostic test records First Unum had received pertaining to this

---

[11] These visits occurred on February 18, 2009, March 18, 2009, March 25, 2009, April 10, 2009, April 29, 2009, May 20, 2009, May 28, 2009, July 2, 2009, and May 10, 2010.  AR 806–08, 862–865, 877–78.

condition.[12]  On October 24, 2008, Tretola visited the Arnold-Chiari Institute; during that visit,

Tretola stated that Dr. Schneider, a neurologist at Long Island Jewish Medical Center, had

informed her that her syrinx did not require surgery.  *Id.* at 774.  Dr. Amit Shelat, a neurologist at

the Arnold-Chiari Institute, advised Tretola to avoid high impact activities, heavy lifting,

pushing, pulling, or carrying of objects greater than 10 pounds.  *Id.* at 770.  The records also

reflected that a magnetic resonance imaging ("MRI") examination was conducted on October 23,

2008, which revealed a "small syrinx in the lower thoracic spinal cord."  *Id.* at 788.  The syrinx

measured 3 millimeters by 2 millimeters.  *Id.*

On August 16, 2010, Dr. Leverett conducted another medical review of Tretola's updated

file, which included the aforementioned medical records.  His conclusions, by condition, were:

*Fibromyalgia*:  Dr. Leverett observed that—while Tretola's rheumatologist had recorded

that, during a May 10, 2010 visit, Tretola had diffuse body pain and widespread fibromyalgia

tender points—it did not appear that Tretola had participated in a comprehensive pain

management program to help address her pain symptoms.  *Id.* at 973.  He concluded that Tretola

appeared "to have a number of diffuse somatic complaints that likely have a psychological

component (*e.g.* depression) which has not been adequately addressed."  *Id.*

*IBS*:  Dr. Leverett noted that Tretola's IBS appeared to be "improved and stable," as her

weight was "relatively stable with noted appearance as 'well nourished,'" and that her condition

"did not rise to a level of impairment."  *Id.*

---

[12] Dr. Rudansky also submitted, *inter alia*, correspondence between him and Dr. Steven J.
Schneider, a neurologist who evaluated Tretola's syringomyelia; on January 16, 2002, Dr.
Schneider, a neurologist, wrote a letter to Dr. Rudansky, stating that Tretola had a "small
syrinx," which caused "some sensory symptoms, a little bit of weakness in the lower extremity,"
but finding that she was still able to rollerblade.  AR 956.  After a follow-up visit, Dr. Schneider
again wrote to Dr. Rudansky on May 15, 2002 that Tretola had a "very small syrinx.  Her
symptoms have resolved almost down to just a mild aching in her back.  She looks well."  *Id.* at
955.

*Syringomyelia*:  Dr. Leverett found that Tretola's syringomyelia appeared to be a "stable and diminutive" condition "with likely no clinical manifestation or indication for surgical intervention."  *Id.*  Dr. Leverett also found that Tretola's syringomyelia "did not rise to a level of impairment."  *Id.*

Because of Tretola's "continued reports of minimal activity," Dr. Leverett concluded that Tretola did not appear able to "reliably sustain work."  *Id.* at 974.   However, Dr. Leverett noted that Tretola had a "good" prognosis for returning to a condition consistent with her job.  *Id.*

### 2.    Dr. Leverett's April 1, 2011 Medical Review

First Unum continued to receive updated medical records and statements from Tretola's attending physicians.  Notably, Tretola's primary care physician, Dr. Burns; her neurologist, Dr. Rudansky; her rheumatologist; Dr. Cohen; and her new primary care physician based in North Carolina, Dr. Geoffrey Jones, submitted statements, notifying First Unum that Tretola did not have the functional capacity to perform the demands of her position as a senior purchasing specialist on a full or part time basis.  *Id.* at 1015, 1024, 1046, 1180.

On January 6, 2011, Dr. Jones provided medical records of Tretola's office visits[13] and treatments.  Tretola had begun visiting Dr. Jones on October 8, 2010, and, although she complained of joint pain and constipation during her first visit, *id.* at 1199, by October 29, 2010, she reported "better" IBS symptoms, *id.* at 1195.  During her December 27, 2010 visit, Tretola reported "having better pain control with the long-acting morphine."  *Id.* at 1181.  To alleviate Tretola's fibromyalgia symptoms, Dr. Jones had referred Tretola to pool therapy, but, after canceling several sessions, she unilaterally decided to terminate that form of therapy because, she stated, the exercises were causing her too much pain.  *Id.* at 1111–14.  On February 8, 2011,

---

[13] Dr. Jones provided records of visits between October 2010 and December 2010.  AR 1180–85, 1190–1202.

Dr. Jones provided an attending physician statement, stating that "[g]iven the intermittent nature of her symptoms, [Tretola] will continue to have good days [and] bad days." *Id.* at 1180.

*Medical Review*:  On April 1, 2011, Dr. Leverett completed another written review of Tretola's updated medical history.  *See id.* at 1611–17.  This review encompassed the newly provided medical records from Tretola's treating physicians and the aforementioned Social Security materials.  Dr. Leverett concluded the following, by condition:

*Fibromyalgia*:  Dr. Leverett noted that for Tretola's Social Security internal medical exam, Dr. Stefanides had identified 12 out of 18 possible trigger points,[14] but noted no other deficits on physical examination.  Dr. Leverett wrote that:

> In general, individuals with fibromyalgia are able to work.  There are no specific physical findings in the file that suggest [Tretola] would be unable to manage sustainable work due to fibromyalgia.  This includes no documented abnormalities on examination of the joints, no documented evidence of muscle atrophy, and a lack of neurological abnormalities.  The paucity of findings is not supportive of the opinion that [Tretola] is precluded from work due to fibromyalgia. . . .  [W]hile [Tretola] notes significant pain on some days limiting her activities, there is no risk of injury associated with pain due to fibromyalgia.  It is medically likely that [Tretola's] . . . adjustment disorder with anxiety, depressed mood[] impact her perception of pain, and her pain complaints would not be as severe if her [] conditions were not present or adequately addressed.

*Id.* at 1615.

Dr. Leverett's assessment of Tretola's then-condition thus diverged from the SSA ALJ's assessment of her condition as of April 24, 2009; Dr. Leverett also expressed skepticism of the ALJ's assessment of a 2009 disability.  He noted that the ALJ's decision on appeal did "not appear to be based on medical or diagnostic examinations, but rather on [Tretola's] reports of pain, infirmity and decreased function.  The ALJ's assessment that [Tretola] ha[d] less than

---

[14] To support a diagnosis of fibromyalgia, a doctor must identify "[t]ender points . . . present in at least eleven of eighteen predetermined body parts" and "the presence of widespread chronic pain present to at least three months in all four quadrants of the body."  *Rodriguez*, 297 F. Supp. 2d. at 678.

sedentary work capacity is overly restrictive, given [Dr. Stefanides'] evaluation in December

2009 and given [Tretola's] own reports of functional activity at home." *Id.* at 1615–16. Further,

Dr. Leverett stated, "[w]hile [Tretola] note[d] significant pain on some days limiting her

activities, there [was] no risk of injury associated with pain due to fibromyalgia." *Id.* at 1615.

Although Tretola continued to report a "relatively sedentary lifestyle," she also reported that on

"good days," she was able to perform light housework and drive. *Id.* Dr. Leverett also

highlighted that Tretola, at that time, had plans to travel to California for three months. *Id.* Dr.

Leverett emphasized that there were "no documented abnormalities on examination of the joints,

no documented evidence of muscle atrophy, and a lack of neurological abnormalities." *Id.*

     *IBS*:  Dr. Leverett found that Tretola did report "intermittent exacerbations of her IBS,"

but that this did not rise to a level of impairment. *Id.* at 1616.

     *Syringomyelia*:  Dr. Leverett also found that Tretola's syringomyelia "condition, by itself

or in combination with other conditions, [did] not rise to level of impairment" as the condition:

> has been noted to be stable and diminutive with likely no clinical manifestation or
> indication for surgical intervention.  There is no documentation of clinical
> examinations demonstrating weakness, atrophy or focal neurosensory deficits.  It
> does not appear that [Tretola] has had followup for this condition for
> approximately 2 years.

*Id.* at 1616. Thus, Dr. Leverett concluded, there was "a paucity of positive clinical examination

findings and corroborating diagnostic and laboratory/serology studies to support [Tretola's]

consistent complaints of pain and functional deficits." *Id.* Dr. Leverett found that, based on

Tretola's file, she had the physical functional capacity required for her positions as senior

purchasing specialist (*i.e.*, occasionally exerting up to 20 pounds; frequently exerting up to 10

pounds, sitting, reaching, handling, and fingering; occasionally standing, walking, and driving)

*Id.*

Dr. Leverett further took issue with Tretola's self-reported complaints of pain, and the lack of studies and tests to support her subjective complaints, stating that:

> Pain is a phenomenon that cannot be measured, but rather is based on one's perception of their pain and their report to the evaluator, and the evaluator's documentation of said pain. Reports of pain by an individual cannot otherwise be measured or verified, although positive signs on examination or corroborating diagnostic or laboratory studies can potentially support one's pain complaints. Such is not the case here.

*Id.* As a next step, Dr. Leverett proposed contacting Dr. Jones to better understand Tretola's condition. *Id.*

### 3.    Dr. Leverett's August 1, 2011 Medical Review

On April 4, 2011, Dr. Leverett wrote to Dr. Jones, Tretola's primary care physician, asking about Tretola's medical condition; on April 11, 2011, Dr. Jones responded. *Id.* at 1627–29. Dr. Jones agreed with Dr. Leverett that Tretola's "extensive laboratory and diagnostic evaluations ha[d] not yielded significant abnormalities. [He had] also not found significant permanent physical findings on previous visits, either." *Id.* at 1627. Dr. Jones noted that although there was no definitive blood test to affirm Tretola's diagnosis of fibromyalgia, Tretola did meet "clinical criteria." *Id.* Dr. Jones added that Tretola was an "interesting and complicated patient," who, "on good days, . . . may be able to perform the functions of her previous occupation as a senior purchasing specialist," because the required activities for that occupation were "not beyond her means on an occasional basis." *Id.* at 1628. However, Dr. Jones did not find that Tretola could do such work on a full-time basis. *Id.* Dr. Jones did not discuss Tretola's IBS condition in his letter responding to Dr. Leverett. *See id.* at 1627–29.

On July 19, 2011, Dr. Edward Lewis, a pain management doctor, also submitted records to First Unum. *Id.* at 1672–88. These reflect that a non-contrast MRI had been conducted on March 21, 2011, which confirmed that Tretola had a "small syrinx measuring up to 4 mm in

short axis dimension and 3 cm in long axis dimension." *Id.* at 1678.  On April 18, 2011, a MRI

with contrast was conducted; the records stated that a "syrinx, particularly involving the distal

cord, is again observed.  There is no evidence of abnormal intramedullary enhancement." *Id.* at

1683.  To mitigate Tretola's pain related to fibromyalgia, Dr. Lewis conducted trigger point and

Botox injections.  *Id.* at 1688–91.

On August 1, 2011, Dr. Leverett, with the updated records and correspondence with Dr.

Jones, issued another medical review of Tretola's medical records.  *Id.* at 1730.  By condition, he

determined the following:

*Fibromyalgia*:  Dr. Leverett reviewed Tretola's treatment by Dr. Lewis (*i.e.*, the trigger

point and Botox injections) as well as her lack of participation in the pool therapy.  *Id*.  Again,

Dr. Leverett recommended that Tretola participate in a "comprehensive pain management

program which would involve cognitive behavioral therapy and a regular graded exercise

program including aquatic exercises," and concluded that Tretola still appeared "to have a

number of diffuse somatic complaints that likely have a psychological component (e.g.

depression) which ha[d] not been adequately addressed." *Id*.

*IBS*:  Dr. Leverett noted that Tretola's IBS appeared to be "stable," and that she was not

being regularly treated by a gastroenterologist.  *Id.*  He concluded that her "condition does not

rise to a level of impairment." *Id.*

*Syringomyelia*:  Dr. Leverett noted that the MRI "revealed slight increase (1 cm) in size

of her previously identified thoracic syringomyelia." *Id.*  However, Dr. Leverett concluded that:

> There does not appear to be a recent evaluation by neurosurgery.  [Tretola's]
> syringomyelia has been noted to be essentially stable with likely no indication for
> surgical intervention.  There is no documentation of clinical examinations
> demonstrating weakness, atrophy or neurosensory deficits.  This condition does
> not rise to a level of impairment.

*Id.*

In sum, Dr. Leverett concluded, Tretola could physically perform the activities

required for her occupation. *Id.*  Specifically, Dr. Leverett noted that:

> [Tretola] reports doing light housework, shopping, and owns a large dog.
> Although [Tretola] would likely be somewhat deconditioned as she has not
> worked for over 2 years, clinical examinations have not revealed atrophy; strength
> is normal.  The file data does not support that [Tretola] would not be able to
> physically perform exertion of up to 20 pounds of force occasionally or up to 10
> pounds of force frequently; frequently sit, reach, handle and finger; occasionally
> stand and walk; and drive.

*Id.* at 1731.

Because Dr. Leverett's conclusions as to Tretola's functional capacity differed from those

of Dr. Jones, Dr. Leverett recommended that a designated medical officer review Tretola's file.

*Id.*

### 4.      Dr. Sentef's August 3, 2011 Medical Review

On August 3, 2011, Dr. Joseph Sentef, a First Unum-designated medical officer,

reviewed Tretola's administrative record. *Id.* at 1963.  Dr. Sentef ultimately concurred with Dr.

Leverett:  As to IBS, Dr. Sentef found that there was no evidence that Tretola was having

"excessive diarrhea"; as to fibromyalgia, Dr. Sentef found her condition "very stable" with "no

demonstrated weakness, atrophy or neurosensory deficits on physical examination"; and as to

syringomyelia, Dr. Sentef also found her diagnosis "stable." *Id.* at 1738–39.  Specifically:

*Fibromyalgia*:  Dr. Sentef noted that while Dr. Stefanides, the doctor who had performed

the Social Security internal medical exam, had identified 12 out of 18 trigger points,[15] no control

points were found. *Id.* at 1737.  Dr. Sentef further concluded that "[e]ven if [Tretola] had

---

[15] According to the American College of Rheumatology, 11 out of 18 trigger points need to be
documented to substantiate a fibromyalgia diagnosis.  AR 1739.

fibromyalgia, it would not preclude her from being able to perform a sedentary or light demand level occupation."  *Id.*

*IBS*:  Dr. Sentef recognized that Tretola had been having "intermittent exacerbations of her IBS."  *Id.* at 1738.  However, Dr. Sentef noted that Tretola had stopped visiting a gastroenterologist, and did not appear to be taking any medication or having ongoing treatment. *Id.*  Dr. Sentef also observed that Tretola's weight had not changed, and thus found that this condition did not reach the level of impairment.  *Id.*

*Syringomyelia*:  Dr. Sentef noted that Tretola had had this condition "for many years and this has been monitored serologically and by MRI.  There is nothing in the medical file that would indicate any exacerbation of this diagnosis."  *Id.*

 Dr. Sentef, concurring with Dr. Leverett, concluded that Tretola appeared "to be on excessive pain medication for her diagnoses, which all appear to be stable. . . .  It is unclear why the claimant might be having so much pain."  *Id.*

Because Tretola's position as senior purchasing specialist required her to work extended hours frequently and travel at least several days a month, sometimes internationally, First Unum requested that Dr. Leverett and Dr. Sentef evaluate whether Tretola would have the functional capacity to complete such tasks.  On August 29, 2011, Dr. Leverett concluded that she did, *id.* at 1745; on August 30, 2011, Dr. Sentef again concurred with Dr. Leverett, *id.* at 1751.

Less than a month later, First Unum again commissioned surveillance of Tretola.  On September 20–21, 2011, surveillance was conducted at Tretola's home in Tryon, North Carolina, but it did not observe any activity on her part.  *Id.* at 1763, 1768–70.

### 5.      Tretola's Functional Capacity Evaluation

On October 5, 2011, First Unum informed Tretola that it sought a functional capacity

evaluation (FCE) to further evaluate her conditions.  *Id.* at 1800.  A FCE is a series of tests

administered to determine a person's maximum ability to safely perform work-related functions.

*Id.* at 1993.  These tests include performing tasks such as lifting, bending, and reaching.  *Id.*

Administrators of the tests explain all tests to participants before testing.  *Id.*

Although Tretola's attending physician, Dr. Jones, gave the FCE administrator clearance

for Tretola to lift up to 25 pounds, Tretola refused to lift more than 10 pounds, citing Dr.

Rudansky's direction that she not lift above that weight.  *Id.* at 2040.  In her November 1, 2011

report, Klaudia Czaplinska, the evaluator of Tretola's FCE, concluded that Tretola

"demonstrated the ability to meet the physical demand requirements of a Senior Purchasing

Specialist based on the job description provided with the exception of any lifting which was not

tested.  However she may not be able to maintain this level of work over an 8 hour day due to

limiting factors such as pain and fatigue."  *Id.* at 2051.  Specifically, Tretola:

> demonstrated the ability to occasionally and frequently carry up to 10 lbs,
> occasionally push 23 lbs of force, and pull 20 lbs or force. Melissa Tretola
> demonstrated Frequent sitting, Frequent standing, Frequent walking, Occasional
> stair climbing, Frequent reaching at desk level, Frequent reach at overhead level,
> Constant balancing, Occasional stooping, Occasional kneeling, Occasional
> crouching, Occasional crawling, Frequent object handling, Frequent fingering,
> Frequent simple hand grasp, Frequent firm hand grasp, and Frequent fine/gross
> hand manipulation.

*Id.*

Because Tretola declined to fully participate in the FCE (*i.e.*, lift more than 10 pounds),

First Unum declared the FCE results invalid.  *Id.* at 2100.

### 6.    Dr. Diez's January 27, 2012 Independent Medical Evaluation

Because the FCE had been found not valid, First Unum scheduled Tretola to attend an Independent Medical Evaluation ("IME").  *Id.*   Before the IME, First Unum continued to receive medical records from Tretola's treating physicians.

On January 17, 2012, Dr. Jones provided updated medical records to First Unum, detailing office visits between March 2011 and January 2012.[16]  Tretola, earlier in the period covered by these records, primarily complained of her IBS condition, but by November 18, 2011, Dr. Jones reported after an office visit that Tretola had "been able to gain some weight and eat more.  She does not have explosive diarrhea any more, but still has pain and difficulty eating.  GI does not feel the need for any additional testing at this point."  *Id.* at 2940.  On May 18, 2011, Dr. Jones also noted that Dr. Lewis had performed a trigger point injection in Tretola's "left trapezius, which has helped. . . .   He thought that her symptoms are due mostly to fibromyalgia." *Id.* at 2984.  During that same visit, Dr. Jones stated that Dr. Pikus had observed Tretola's MRIs and "does not think that anything has changed.  He will see her back as needed."  *Id.*

First Unum also received records from Dr. Joel Callahan, Tretola's neurologist.  *Id.* at 2874.  On January 13, 2012, Dr. Callahan notified First Unum that Tretola's current diagnosis was back pain and syringomyelia.  *Id*.  Dr. Callahan also stated that Tretola could not work full time, as she could not lift more than 10 pounds or bend.  *Id.* at 2874–75.  Finally, in response to First Unum's question regarding his prognosis for Tretola's return to employment on a full-time basis, Dr. Callahan wrote "her syrinx is going to be present—lifetime."  *Id.* at 2875.  However, in

---

[16] The visits occurred on March 9, 2011, March 28, 2011, May 18, 2011, July 1, 2011, August 16, 2011, August 22, 2011, September 6, 2011, September 9, 2011, November 18, 2011, December 19, 2011, and January 16, 2012.  AR 2924–3001.

a record made following a January 10, 2012 office visit with Tretola, Dr. Callahan wrote that

Tretola's syringomyelia condition appeared to be "stable."  *Id.* at 2909.

Before Tretola's IME, First Unum again commissioned surveillance of Tretola:  This

time, on January 17, 2012, she was seen driving to a local convenience store alone.  *Id.* at 3005,

3016–17.  On January 18, 2012, she again was seen driving to a local veterinarian clinic and then

to the location of her IME.  *Id.* at 3008, 3017.

On January 18, 2012, Dr. Edgardo Diez, a physiatrist, examined Tretola.  *Id.* at 3039.  On

January 27, 2012, Dr. Diez submitted his report to First Unum.  *Id.* at 3037.  His assessment, by

condition, was as follows:

*Fibromyalgia*:  Dr. Diez noted that there was a "lack of objective findings" on which

Tretola's fibromyalgia could be found "severe."  *Id.* at 3049.  Further, Tretola, Dr. Diez

observed, had "other symptoms that are not related to fibromyalgia and involving other joints

that are not common in this condition such as in her feet."  *Id.*  The condition, Dr. Diez

concluded, should not prevent Tretola from maintaining gainful employment or performing her

job as senior sourcing specialist.  *Id*.

*IBS*:  Dr. Diez concluded that her condition was a "diagnosis of exclusion," *id.* at 3050,

meaning that her condition was diagnosed by a process of eliminating other possible physical

causes, *see Sparkes v. Morrison & Foerster Long-Term Disability Insurance. Plan*, 129 F. Supp.

2d 182, 188 (N.D.N.Y. 2001).  Although conceding that he was not an expert in this area, Dr.

Diez stated that from his review of Dr. Purow's records, he did not "feel this condition should

prevent [Tretola] from performing her job."  AR 3050.

*Syringomyelia*:  During Dr. Diez's evaluation of Tretola's syringomyelia, Tretola

admitted that she suffered only from weakness in her left leg from this condition.  *Id.*  Further,

Tretola admitted to Dr. Diez that "this condition has not been the reason for leaving her job for medical reasons." *Id.* Dr. Diez concluded that there thus should not be limitations or restrictions in terms of performing her job as a result of this condition; rather, she should be able to perform her former occupation, as senior sourcing specialist, on a full-time basis. *Id.*

On February 13, 2012, Dr. Callahan, Tretola's neurologist, after speaking on the phone with Dr. Leverett, sent a fax to First Unum stating that "an IME has evaluated [Tretola] and found that she is able to work—I am deferring to that evaluation and report." *Id.* at 3100.

### 7.   First Unum's Termination of Tretola's Benefits

On March 19, 2012, First Unum notified Tretola that she was no longer entitled to disability benefits, effective February 14, 2012. *Id.* at 3128. Specifically, First Unum noted that (1) it was "unclear" if Tretola's fibromyalgia diagnosis was accurate; (2) Tretola had successfully managed her IBS with diet; and (3) her syringomyelia, a longtime condition, had not demonstrated any worsening. *Id.* at 3129–30. First Unum noted that Tretola had informed First Unum that she was seeing a neurologist, Dr. Mendelsohn, beginning in February 2012, but that he had not provided to First Unum any proposed restrictions and limitations on her activity or an assessment of Tretola's function. *Id.* at 3131. First Unum also noted the differences between its conclusion and the SSA's award: First Unum emphasized that Tretola had stopped receiving treatment from a gastroenterologist for her IBS, and that her pain medications, trigger point injections, and Botox injections had all improved her pain. *Id.* at 3132.

### E.   Tretola's Appeal of First Unum's Termination Decision

Tretola, represented by counsel, appealed First Unum's termination decision. *Id.* at 3227. Tretola submitted a variety of materials in support of her appeal, including a vocational report, an IME, and medical statements from her treating physicians.

The vocational report, prepared by Amy Leopold, a vocational expert, concluded that

Tretola's occupation was most similar to a "Purchasing Agent," occupation number

162.157-037.[17]  *Id.* at 3262–64.  According to Leopold, such a position required:

> "frequent" standing and walking and . . . exerting force to 20 pounds occasionally
> or 10 pounds frequently. . . .  standing and or walking 6 hours out of an 8 hour
> day and sitting 2 hours out of an 8 hour day. . . .  pushing and or pulling. . . .
> occasional reaching, handling, and fingering.

*Id.* at 3263.

Tretola also submitted an August 9, 2012 IME report, conducted by Dr. Robert Schwartz.

*Id.* at 3340.  Dr. Schwartz primarily reviewed Tretola's medical history.  He concluded that:

> Based on today's physical findings, the records, and her emotional presentation, I
> do not think that it is likely that she would be employable or be consistent at
> attending work.  I do not think a restriction based simply on a lighter sedentary
> physical demand level is applicable due to her chronic IBS, bouts of diarrhea,
> irritable bowel, and associated somatovisceral complaints.  Based on the rather
> prolonged and consistent complaints that she has had through multiple providers
> over multiple years that have been frequently and repeatedly documented, I do
> believe that this patient is sincere and that her presentation is most probably
> consistent with somebody who is not functioning effectively on a daily basis.

*Id.* at 3343.

Tretola also submitted statements from Dr. Jones, Dr. Mendelsohn, Nurse Patricia Rogers

(who worked with Dr. Rudansky), and Dr. Callahan.  Dr. Jones primarily emphasized Tretola's

IBS condition; in an August 22, 2012 statement, Dr. Jones stated that her IBS led to:

> debilitating abdominal pain, frequent constipation, cramping.  She has chronic
> symptoms as well as intermittent flares, which make it difficult to eat and result in
> weight loss.  The symptoms have been more or less unchanged since I assumed
> her care in 2010.  Several different treatment trials have not successfully managed
> her symptoms.

*Id.* at 3268.  Dr. Mendelsohn, Nurse Rogers, and Dr. Callahan all opined on Tretola's

fibromyalgia, with Dr. Mendelsohn, most notably, opining that Tretola was "totally disabled at

---

[17] Leopold's source was the *Dictionary of Occupational Titles*.

28

this point" with no expectation for significant improvement for the next year.  *Id.* at 3274.  Dr.
Mendelsohn also found that Tretola "cannot work at all."  *Id.* at 3272.  Tretola's parents (Patricia
and Michael Tretola), Tretola's aunt and uncle (Patricia and Glenn Gianino), and Tretola's friend
of five years (Bayardo Gomez) also submitted affidavits attesting to witnessing Tretola's
conditions and their effects on her.  *Id.* at 3345–47, 3641–42.

In connection with Tretola's appeal, First Unum sought Tretola's medical records from
all of her medical providers.  Among the updated records First Unum received were records from
Dr. Joel Callahan, Tretola's neurologist.  During an April 26, 2012 visit, Dr. Callahan assessed
that Tretola's syringomyelia was "unchanged."  *Id.* at 3371.  On June 27, 2012, Dr. Callahan
evaluated Tretola's syringomyelia as "stable" and that "[n]otes from NY [did] not show any
significant difference than what we have found here."  *Id.* at 3379.  On August 27, 2012, Dr.
Callahan, after another office visit, stated that Tretola's syringomyelia was "[u]nchanged."  *Id.* at
3383.  Although Tretola experienced mild weakness in her left foot, Dr. Callahan concluded that
there was "no significant worsening from before" and did not require a brace.  *Id.*

First Unum's attempts to receive records from Tretola's other medical providers,
however, were rebuffed by Tretola's counsel.  In an October 12, 2012 letter responding to such a
request, Tretola's counsel stated:

> It is obvious that the medical evidence overwhelmingly supports Ms. Tretola's
> entitlement to disability benefits under the policy.  That was made clear by the 65
> pages of appeal comments and accompanying evidence.  Your request for
> superfluous and redundant medical records is a[] transparent grasping at straws in
> a desperate attempt to find some excuse to arrive at a contrary conclusion.  I
> suggest that you stop wasting time, and make your decision.  You are required to
> interpret the information from Ms. Tretola's [sic] fairly, and it is impossible to do
> so and conclude that they do not support her entitlement to benefits.

*Id.* at 3459.  Further, Tretola's counsel stated that:

> There is no way that Unum can interpret the reports of its doctors in a fair and objective manner to conclude that their paid opinions should supplant those of the treating doctors. There is no excuse for rejecting the opinion of any of Ms. Tretola's doctors. Before Unum makes its final decision, it is obligated to contact any treating doctor before it rejects their opinion. Whatever excuse Unum intends to concoct to reject a treating opinion, the treating doctor needs to be given the opportunity to address the alleged excuse. Otherwise, Unum could not say that it performed a full and fair review.

*Id.* at 3459–60.

On October 29, 2012, Dr. Beth Schnars, a First Unum physician consultant, conducted a physician review of Tretola's medical file. *Id.* at 3533. She concluded that there was no physiologic evidence to support ongoing impairment, which would preclude work at the full time level. *Id.* at 3539. Specifically, by condition, Dr. Schnars noted:

*Fibromyalgia*: Dr. Schnars observed that Tretola had had a "very brief trial" of aquatic therapy, but needed further therapy, such as "ongoing aerobic activity." *Id.* at 3540. Further, Dr. Schnars found that Tretola's pain complaints and behavior were in excess of identifiable anatomic or physiological abnormalities. *Id.*

*IBS*: Dr. Schnars noted that Tretola's medical records had "little comment of GI symptoms in treatment records from [January 2012] onward including the two IME exams although the primary care provider [Dr. Jones] in letter of advocacy in [September 2012] notes predominantly GI issues as barrier to work return." *Id.*

*Syringomyelia*: Dr. Schnars found that "the medical records do not identify any progression of symptoms . . . which would preclude work at Ms. Tretola's previous level of activity." *Id.*

After completing the review, Dr. Schnars attempted to contact Dr. Mendelsohn and Dr. Rudansky several times but was rebuffed. *Id.* at 3546, 3547. On November 17, 2012, Tretola's counsel sent a letter to First Unum, warning First Unum to "avoid communicating with

Ms. Tretola or her doctors without [Tretola's counsel's] prior approval." *Id.* at 3566. According to Tretola's counsel, First Unum's attempts to communicate with Dr. Rudansky amounted to "vexatious harassment" and were interfering with Tretola's treating relationship with Dr. Rudansky. *Id.* He added that "[a]ny further attempt to do so will result in charges beig [sic] filed with the Insurance Department." *Id.*

On November 20, 2012, Richard Byard, a First Unum vocational specialist, conducted a review of Leopold and Maxcy's vocational reports. *Id.* at 3569. Specifically, Leopold and Maxcy disagreed about whether or not "light" positions required *frequent* walking and standing (Leopold's position) or *occasional* walking and standing (Maxcy's position). *Id.* Byard concluded that Leopold's position:

> misrepresents and misinterprets the definition of "Light" work as contained in the Dictionary of Occupational Titles. An occupation may be classified as requiring a "Light" level of work based on one or more of the multiple conditions cited in the DOT physical strength demand definition. It is simply incorrect to assert that all "Light" occupations require standing and walking for 6 hours.

*Id.* at 3570.

On November 28, 2012, First Unum issued its appeal decision, upholding the denial of long-term disability benefits. *Id.* at 3573. First Unum concluded that "[o]ther than Ms. Tretola's self-reported level of pain, the medical records are not consistent with impairment severe enough to preclude her from working in her regular occupation." *Id.* at 3577. By condition, First Unum stated:

*Fibromyalgia*: First Unum reported that it had not received records from Dr. Mendelsohn, Tretola's neurologist. *Id.* at 3575. It also recounted that lab work for connective tissue disease and acute inflammation, as well as imaging studies of Tretola's peripheral joints, were negative. *Id.* First Unum noted that Dr. Mendelsohn, in his letter, "supported impairment

31

because of chronic pain from fibromyalgia.  He said this had not changed significantly in the last six months." *Id.*  First Unum concluded that:

> The treatment for fibromyalgia is daily aerobic activity, cognitive behavioral therapy and certain medications such as tricyclic antidepressants and some neuropathic pain medications.  Ms. Tretola had a very brief trial of aquatic therapy.  She has not been recommended for ongoing aerobic activity or cognitive behavioral therapy.

*Id.*

*IBS*:  First Unum reported that although Tretola's diagnostic evaluation did not result in a diagnosis of IBS, Dr. Purow, her gastroenterologist, had concluded that she had IBS.  *Id.*  First Unum also observed that Tretola had maintained a "stable" weight, and that a recent colonoscopy returned a negative result.  *Id.*

*Syringomyelia*:  First Unum noted that Tretola was diagnosed with a syrinx in 2001, and that her "[n]eurological exams were negative." *Id.* at 3574.  Further, First Unum found that:

> Ongoing imaging studies have not shown any progression of the syrinx.  A 2008 evaluation at the Chiari Institute concluded the lesion was not likely to be causing any symptoms.  Ongoing neurology records do not document any neurological deficits.  Ms. Tretola's physicians have not recommended surgery for this condition.

*Id.*

First Unum also discussed the IMEs conducted by Dr. Diez and Dr. Schwartz.  First Unum noted that Dr. Diez concluded that Tretola had fibromyalgia, "stable" syringomyelia, and IBS, but that these conditions did not prevent her from "gainful employment or working as a senior sourcing specialist." *Id.* at 3576.  First Unum observed that in Dr. Schwartz's IME, he did not assess her tender points, although Dr. Schwartz concluded that Tretola had fibromyalgia and thus "would not be employable or consistent in attending work." *Id.*

First Unum acknowledged that its decision diverged from ALJ Firestone's determination that Tretola, in April 2009, had been disabled based on a combination of fibromyalgia and IBS. *Id.* at 3577.  First Unum explained that, as of February 2012, (1) Tretola no longer was being treated by a gastroenterologist, and (2) both IMEs noted normal peripheral joint and neurological exams, while showing "non-specific tenderness with palpation."  *Id.*  First Unum concluded that, in reaching their opposing conclusions, Dr. Diez weighed the medical evidence more heavily, whereas Dr. Schwartz gave greater weight to Tretola's self-reported complaints and symptoms. *Id.*  First Unum further found that the statements from Tretola's treating physicians (Dr. Jones, Dr. Mendelsohn, Nurse Rogers, and Dr. Callahan) derived from Tretola's reported pain.  *Id.* at 3578.

First Unum also instructed Tretola that, if she disagreed with First Unum's decision, she had a right to bring a civil suit under section 502(a) of ERISA.  *Id.* at 3579.

### F.    History of this Lawsuit

On January 10, 2013, Tretola filed this action for the reinstatement of her long-term disability benefits. Dkt. 1 ("Compl.").  Tretola's Complaint alleges, *inter alia*, that First Unum (1) had a conflict of interest as the ERISA plan administrator and payer of plan benefits, (2) failed to comply with policy terms; and (3) terminated her long-term disability benefits without evidence to support its decision.  *Id.* ¶¶ 183–85.  The Complaint seeks, *inter alia*, a declaratory judgment that Tretola continued to be disabled, as of February 14, 2012, and an order directing First Unum to compensate Tretola, in accordance with the policy terms.  *Id.* at 60.

On March 8, 2013, First Unum answered. Dkt. 4 ("Answer").  It stated, *inter alia*, that its decision to terminate Tretola's long-term disability benefits had been "reasonable and was

neither arbitrary or capricious" and should be reviewed by the Court by the deferential standard of review.  *Id.* at 22.

On May 6, 2013, First Unum submitted a letter to the Court, in which it acknowledged that a conflict of interest existed in its long-term disability benefits determination in this case, insofar as First Unum both determined whether the claim was payable and paid the claim.  Dkt. 7, at 3.  On June 13, 2013, the Court issued a decision, granting Tretola limited discovery into First Unum's acknowledged conflict of interest.  *See* Dkt. 9.  Given First Unum's "well-documented history of abusive tactics," *McClauley v. First Unum Life Ins. Co.*, 551 F.3d 126, 137 (2d Cir. 2008) (citing John H. Langbein, *Trust Law as Regulatory Law: The Unum/Provident Scandal and Judicial Review of Benefits Denials Under ERISA*, 101 Nw. U. L. Rev. 1315 (2007)), and the Supreme Court's command in *Metropolitan Life Ins. Co. v. Glenn*, 554 U.S. 105 (2008), that courts should weigh conflicts of interest as a factor in reviewing an ERISA benefits determination, the Court found that discovery into the conflict was permitted. Dkt. 9, at 4.  The Court also stated that it would determine the standard of review after the close of discovery.  *Id.* at 5.

On September 13, 2013, discovery as to the conflict of interest ended.  Dkt. 32, at 1.  On October 11, 2013, First Unum, in a letter to the Court, conceded that the *de novo* standard of review was applicable to this case, Dkt. 29, at 1–2, because the policy did not contain "language stating that the award of benefits is within the discretion of the plan administrator or language that is plainly the functional equivalent of such wording," *Kinstler v. First Reliance Standard Life Ins. Co.*, 181 F.3d 243, 252 (2d Cir. 1999).

On November 14, 2013, the Court agreed that the appropriate standard of review in this case is *de novo*.  Dkt. 32, at 2.  The Court also granted a "short period" of limited merits

discovery, which both parties acknowledged was warranted, to permit discovery into matters outside of the administrative record to determine if there was "good cause" to consider extrinsic evidence in reviewing the ERISA benefit denial, *DeFelice v. American Int'l Life Assurance Co.*, 112 F.3d 61, 67 (2d Cir. 1997). *Id.* at 2–3. The Court emphasized, however, that the decision to permit discovery into matters outside the administrative record did not mean that such materials would be admissible at trial or on summary judgment. *Id.*

On June 23, 2014, the Court issued a decision, denying Tretola's motion to submit extrinsic evidence in support of her motion for summary judgment. Dkt. 63, at 1. The Court found that Tretola had not established good cause to admit the extrinsic evidence; specifically, Tretola had not provided evidence showing that First Unum's structural conflict actually resulted in biased claims-handling with respect to her claim. *Id.* at 5. Rather, the evidence that Tretola submitted consisted mostly of journalist reports regarding First Unum's policies and practices before 2004. *Id.* The Court also found that the extrinsic evidence Tretola proffered was irrelevant, and thus excluded by Federal Rule of Evidence 402. *Id.* at 7. In its decision, the Court directed the parties, if they filed motions for summary judgment, to "rely[] *solely* on the evidence in the administrative record" in their filings. *Id.* at 8 (emphasis added).

On July 23, 2014, the parties filed cross-motions for summary judgment, Dkt. 64, 66, and supporting memoranda of law, Dkt. 67 ("Tretola Br."); Dkt. 69 ("First Unum Br."). Tretola seeks summary judgment in her favor on her claim for reinstatement of long-term disability benefits. First Unum, in turn, seeks summary judgment in its favor, on the grounds that it was entitled to terminate Tretola's long-term disability benefits. First Unum also moved to strike Tretola's brief for relying upon evidence outside the administrative record. On August 13, 2014, the parties filed memoranda in opposition, Dkt. 72 ("First Unum Opp. Br."); Dkt. 73 ("Tretola

Opp. Br.").  On August 14, 2014, Tretola submitted a letter, opposing First Unum's motion to strike.  Dkt. 77 ("August 15, 2014 Letter").  On August 15, 2014, First Unum filed a response. Dkt. 82 ("August 15, 2014 Letter").

## II.     Applicable Legal Standards

### A.        Summary Judgment Standard

To prevail on a motion for summary judgment, the movant must "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The movant bears the burden of demonstrating the absence of a question of material fact.  In making this determination, the Court must view all facts "in the light most favorable" to the non-moving party.  *Holcomb v. Iona Coll.*, 521 F.3d 130, 132 (2d Cir. 2008); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

To survive a summary judgment motion, the opposing party must establish a genuine issue of fact by "citing to particular parts of materials in the record."  Fed. R. Civ. P. 56(c)(1); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009).  "A party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (citation omitted).  Only disputes over "facts that might affect the outcome of the suit under the governing law" will preclude a grant of summary judgment.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In determining whether there are genuine issues of material fact, the Court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought."  *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir.  2012) (citing *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)).

B.      *De Novo* **Standard of Review**

This action is governed by ERISA, 29 U.S.C. § 1001, but "ERISA does not set out the

applicable standard of review for actions challenging benefit eligibility determinations."

*McDonnell v. First Unum Life Ins. Co.*, No. 10 Civ. 8140 (RPP), 2013 WL 3975941, at *7

(S.D.N.Y. Aug. 5, 2013) (citation omitted).  The Court, however, has held that it would

review First Unum's decision to deny Tretola's benefits *de novo.  See* Dkt. 32.

When using *de novo* review, the Court "stands in the shoes of the original decisionmaker,

interprets the terms of the benefits plan, determines the proper diagnostic criteria, reviews the

medical evidence, and reaches its own conclusion about whether the plaintiff has shown, by a

preponderance of the evidence, that she is entitled to benefits under the plan."  *McDonnell*, 2013

WL 3975941, at *12.

*De novo* review of a plan administrator's decision "is limited to the record in front of the

claims administrator unless the district court finds good cause to consider additional evidence."

*DeFelice*, 112 F.3d at 67.  "The decision 'whether to admit additional evidence is one which is

discretionary with the district court.'"  *Locher v. Unum Life Ins. Co. of Am.*, 389 F.3d 288, 294

(2d Cir. 2004) (quoting *DeFelice*, 112 F.3d at 66).

C.      **Burden of Proof**

"[A]s a matter of general insurance law, the insured has the burden of proving that a

benefit is covered, while the insurer has the burden of proving that an exclusion applies, and

these principles too are applicable in ERISA cases."  *Critchlow v. First Unum Life Ins. Co. of

Am.*, 378 F.3d 246, 256–57 (2d Cir. 2004) (internal quotation marks and citations omitted).

"Therefore, which party bears the burden of showing medical necessity or its absence depends

on the particular plan.  Where 'medical necessity' is a prerequisite for entitlement to a benefit

37

under an ERISA plan, the burden of proof will generally be on the plan participant." *Mario v.*

*P&C Food Mkts., Inc.*, 313 F.3d 758, 765 (2d. Cir. 2002) (citing *Juliano v. HMO of N.J.*, 221

F.3d 279, 287) (2d Cir. 2000)); *see also Locher v. Unum Life Ins. Co. of Am.*, No. 96 Civ. 3828

(LTS) (HPB), 2002 WL 362769, at *7 (S.D.N.Y. March 7, 2002) ("Plaintiff bears the burden of

proving her entitlement to a disability benefit.").

     The parties here dispute who bears the burden of proof in establishing that Tretola is or is

not entitled to her disability benefits.  Tretola argues that First Unum must prove that Tretola

demonstrated improvement in her condition in order to rescind her disability benefits.  Tretola

Br. 1.  First Unum, by contrast, contends that Tretola must demonstrate, by a preponderance of

the evidence, that she continued to be disabled, as of March 19, 2012,[18] the date upon which her

disability benefits were terminated.  First Unum Resp. Br. 2.

     On this point, the Court sides with First Unum.  As noted, for a plan participant, such as

Tretola, to receive a benefit under an ERISA plan, the plan participant, not the plan provider,

bears the burden of proving her disability.  *Locher*, 2002 WL 362769, at *7.  Therefore, in this

case, Tretola must demonstrate, by a preponderance of the evidence, that she was disabled as of

February 14, 2012, to be entitled to disability benefits under the First Unum policy.  The fact that

Tretola had been judged to be disabled, as of April 2009, is relevant evidence as to that issue, but

it does not shift the burden of proof from Tretola to First Unum.

## III.  Discussion

     Tretola moves for summary judgment, arguing that based on the administrative record,

First Unum should reinstate her long-term disability benefits.  She argues, *inter alia*, that (1) the

---

[18] First Unum incorrectly used the date Tretola was notified of the termination of her disability
benefits, March 19, 2012; the relevant date is the effective date of the termination of her
disability benefits, February 14, 2012.

objective evidence, *i.e.*, her doctor's diagnoses, and subjective evidence, *i.e.*, her complaints of

pain, show that she is disabled; and (2) Dr. Diez, who conducted Tretola's IME for First Unum,

has "questionable credentials."  Pl. Br. 3.  In support of its own motion for summary judgment,

First Unum contends, *inter alia*, that Tretola is not disabled, because (1) Tretola was not treated

by specialists for certain ailments for almost two years before February 14, 2012; and

(2) Tretola's clinical records did not support a finding that any of Tretola's conditions impacted

her functional capacity as relevant to her job.

　　　　The motions for summary judgment are mirror-images of each other, such that although

each party has submitted separate briefs in support of its motion and against its adversary's, each

party's arguments in the two briefs are duplicative and overlapping.  Accordingly, the Court

considers the motions together.

### A.　　　Evaluation of Tretola's Medical Conditions

　　　　The parties contest whether Tretola is "disabled," as defined by the policy.   Tretola claims

to have suffered from three disabling conditions: fibromyalgia, IBS, and syringomyelia.  The

Court evaluates each of the three individually to determine whether she has shown, by a

preponderance of the evidence, that she was disabled, as defined by the policy, on February 14,

2012, so as to merit reinstatement of her long-term disability benefits.  *See McDonnell*, 2013 WL

3975941, at *12.  In assessing Tretola's medical conditions, the Court places particular weight

on the medical opinions most contemporaneous with February 14, 2012, the date on which First

Unum determined she was not disabled, while giving due consideration to evaluations earlier in

time.

　　　　At the threshold, the Court notes that, on various points, based on the administrative

record, Tretola's treating physicians and First Unum's medical consultants disagree in their

medical assessments.[19]   The Court has been mindful of the Second Circuit's teaching that it is inappropriate for a court to grant summary judgment where the resolution of an ERISA benefits dispute entails adopting one medical expert's opinion over another's.   *See Napoli v. First Unum Life Ins. Co.*, 78 F. App'x. 787, 789 (2d Cir. 2003) (summary order) ("Such a credibility determination is appropriate at a trial, but it exceeds the scope of a judge's authority in considering a summary judgment motion."); *see also McDonnell*, 2013 WL 3975941, at *13; *Locher v. Unum Life Ins. Co.*, No 96. Civ. 3828 (BSJ), 1999 WL 731428, at *2 (S.D.N.Y. Sept. 20, 1999).   Accordingly, in considering each of Tretola's conditions, the Court has inquired whether the evidence in the administrative record as to that condition is sufficient to support (1) Tretola's position and (2) First Unum's.   Where the evidence would support a finding in either direction, summary judgment is inappropriate, and a trial must be held to permit the Court to weigh the competing positions, with due attention given to witness credibility.   But where the evidence would support only one finding, the Court has determined that a grant of summary judgment is warranted.

### 1.      Fibromyalgia

Fibromyalgia, an ailment that has "unknown" causation and pathogenesis, has no "objective, specific diagnostic test," but the American College of Rheumatology recognizes "widely-reported subjective symptoms—such as 'the presence of widespread chronic pain present for at least three months in all four quadrants of the body' and 'tender points . . . present

---

[19] In reaching its determinations, the Court has not considered the extrinsic evidence Tretola submitted with her briefs.   *See* Tretola Br.; August 14, 2014 Letter; August 15, 2014 Letter.   That is because, as the Court clearly held in its June 23, 2014 Opinion, the parties were to "rely[] *solely* on the evidence in the administrative record" in their summary judgment filings.   Dkt. 63, at 8 (emphasis added).   The Court therefore denies First Unum's motion to strike Tretola's briefs as moot.   In any event, had the Court considered this extrinsic evidence, it would not have changed the assessments herein.

in at least eleven of eighteen predetermined body parts" as sufficient criteria for diagnosing the condition.  *Rodriguez*, 297 F. Supp. 2d. at 678.  "[E]xperienced physicians do recognize fibromyalgia as a real entity," and in *Rodriguez*, Judge Rakoff concluded that fibromyalgia is a "medically determinable impairment."  *Id.* at 678–79.

The Second Circuit has held that "fibromyalgia is a disabling impairment." *Green-Younger v. Barnhart*, 335 F.3d 99, 108 (2d Cir. 2003).  However, "mere diagnosis of fibromyalgia without a finding as to the severity of symptoms and limitations does not mandate a finding of disability."  *Rivers v. Astrue*, 280 F. App'x 20, 22 (2d Cir. 2008) (summary order).

Here, the parties agree that Tretola has been diagnosed with fibromyalgia, but the medical experts dispute the severity of her symptoms.

On September 23, 2009, Tretola was first diagnosed with fibromyalgia, by Dr. Cohen, her then rheumatologist.  AR 556.  Dr. Cohen found that Tretola exhibited a display of "generalized tender points" and "widespread tenderness," symptoms of fibromyalgia.  *Id.* at 559.  On November 9, 2009, Dr. Cohen, in a short-term disability benefits report for Tretola, stated that she was disabled due to fibromyalgia.  *Id.* at 288.

The parties dispute the severity of Tretola's condition.  Tretola, bearing the burden of proof, must show by a preponderance of the evidence that she was disabled by this condition as of February 14, 2012.  To that end, Tretola relies holistically on the diagnoses and evaluations of her fibromyalgia condition over time.  Apart from Dr. Cohen's initial diagnosis of fibromyalgia, on December 10, 2009, Dr. Stefanides conducted a SSA Internal Medical Exam of Tretola, and found that her fibromyalgia prognosis was "guarded."  *Id.* at 1526.  ALJ Firestone granted Social Security disability benefits to Tretola for her fibromyalgia and IBS conditions, concluding that it "cause[d] her to experience severe constant pain which interferes with her ability to concentrate."

*Id.* at 1457.  Tretola continued to visit Dr. Cohen between February and May 2010; in his records, he found that Tretola still "demonstrate[d] widespread fibromyalgia tender points."  *Id.* at 898.  And on April 11, 2011, Dr. Jones, in response to a letter from First Unum's medical consultant, Dr. Leverett, stated that, though Tretola's fibromyalgia was not confirmed by a definitive blood test, Tretola met "clinical criteria."  *Id.* at 1627.

More recently, after Tretola's long-term disability benefits were terminated by First Unum, she submitted, in support of her appeal of that determination, statements by Dr. Mendelsohn, Nurse Rogers, and Dr. Callahan, regarding her fibromyalgia.  *Id.* at 3274–75, 3334.  Notably, Dr. Mendelsohn found that Tretola, in his opinion, was "totally disabled at this point" with no expectation for significant improvement for the next year.  *Id.* at 3274.

First Unum, for its part, notes that its medical consultants, who analyzed Tretola's conditions, did not find Tretola's fibromyalgia to be so severe as to constitute a disability.  Dr. Diez, who conducted First Unum's IME, noted that there was a "lack of objective findings" to consider Tretola's fibromyalgia to be "severe."  *Id.* at 3049.  Further, Tretola, Dr. Diez observed, had "other symptoms that are not related to fibromyalgia and involving other joints that are not common in this condition such as in her feet."  *Id.*   Tretola's fibromyalgia, Dr. Diez opined, should not have prevented her from gainful employment or performing her job as senior sourcing specialist.  *Id.*   In addition, Dr. Schnars, in evaluating Tretola's appeal, opined that Tretola had not sufficiently undertaken therapy for her condition.  *Id.* at 3540.  For example, in 2011, Dr. Jones recommended Tretola try pool therapy to alleviate her fibromyalgia symptoms.  *Id.* at 1111.  Tretola, however, unilaterally declined to continue that form of treatment, because, she claimed, it caused her too much pain.  *Id.* at 1111–14.  Dr. Schnars also found that Tretola's

pain complaints and behavior exceeded her identifiable anatomic or physiological abnormalities. *Id.* at 3540.

Countering this proof, Tretola asks the Court to discredit Dr. Diez's opinion because, she states, her treating physicians had better medical credentials than Dr. Diez. In effect, Tretola contends that the Court should adopt the opinion of her treating physicians over Dr. Diez. This argument, however, is unavailable to Tretola on a motion for summary judgment, because, as the Second Circuit has held, "[s]uch a credibility determination . . . exceeds the scope of a judge's authority in considering a summary judgment motion." *Napoli*, 78 F. App'x at 789.

Based on the Court's careful review of the administrative record, a fact finder clearly could find for either side as to whether Tretola's fibromyalgia was disabling as of February 14, 2012. Neither side's witnesses on this point—Tretola's treating physicians and First Unum's medical consultants—are unreliable as a matter of law. And Dr. Mendelsohn's assessment of Tretola's fibromyalgia condition is squarely contradicted by Dr. Diez's assessment based on his evaluation of Tretola. *See id.*

Further counseling against a grant of summary judgment, Tretola's counsel refused to provide First Unum with Dr. Mendelsohn's records—a tactic which the Court finds deeply disturbing and entirely unjustified. The Court therefore was unable to determine the factual foundation for Dr. Mendelsohn's opinion of Tretola's fibromyalgia. It is not, for example, clear whether Dr. Mendelsohn's opinion was based on a recent office visit, diagnostic tests, Tretola's self-reported complaints, other data points, or a combination of factors. First Unum, in its decision denying Tretola's appeal of First Unum's termination of her long-term disability benefits, asserted that Tretola's treating physicians' diagnoses were based solely on Tretola's self-reports of pain, a fact which, if true, would tend to reduce the weight to be given to them

relative to a diagnosis also based on a recent firsthand examination.  Due to the non-production of Dr. Mendelsohn's underlying medical records, however, the Court has no evidence on which to know whether First Unum is correct as to the basis on which Dr. Mendelsohn based his conclusion.  The Court can state only that the administrative record is devoid of Tretola's treating physicians' records for the relevant time period.  *See* AR 3575, 3578.

The Court accordingly declines to grant summary judgment to either party on this condition.  There is a material dispute of fact on the issue of whether Tretola's fibromyalgia rendered her disabled as of February 14, 2012.  Trial will be needed to resolve that issue.  To enable the Court to determine at trial the weight that is properly assigned to the testimony and assessments of the witnesses on this issue, the Court directs plaintiff's counsel, <u>forthwith and in all events no later than two weeks from this decision</u>, to produce to defense counsel and the Court all medical records of plaintiff's treating physicians as of February 14, 2012, which First Unum requested but which were not produced.  Counsel for each side will be at liberty at trial to offer these records into evidence and examine witnesses about them.

### 2. IBS

IBS is a "condition marked by abdominal pain; disturbances of evacuation; bloating and abdominal distention; and the passage of mucus in stools."  *Kugielska v. Astrue*, No. 06 Civ. 10169 (PKC), 2007 WL 3052204, at *2 n.3 (S.D.N.Y. Oct. 16, 2007) (quoting *Tabers' Cyclopedic Medical Dictionary* 19th Ed., p. 2024).  Here, as with Tretola's fibromyalgia, the parties agree that Tretola suffered from IBS, but First Unum argues that Tretola was no longer disabled by that condition as of February 14, 2012, whereas Tretola, who bears the burden of proof, argues otherwise.

By way of summary, in 2008, Tretola began to complain of having constipation and diarrhea due to IBS, AR 365, and on February 18, 2009, Dr. Purow, a gastroenterologist, began treating Tretola for her "debilitating abdominal pain [and] . . . severe urgent diarrhea," which, he concluded, could "at times . . . render her incapable of successfully carrying out nearly any job function," *id.* at 296. Dr. Purow observed that although Tretola was "unable to eat meat or dairy," she was "able to tolerate Taco Bell somehow." *Id.* at 811. He also stated that Tretola had lost about 14 pounds during the preceding 18 months. *Id.* In May 2009, an IBS diagnostic test determined that Tretola had a 55% probability of having IBS. *Id.* at 423. On August 14, 2009, Dr. Purow, Tretola's gastroenterologist, submitted a report for Tretola's short-term disability benefits, in which he stated his diagnosis of "severe" IBS and abdominal pain. *Id.* at 292. And SSA ALJ Firestone—rejecting the conclusion of Dr. Stefanides based on his December 10, 2009 SSA Internal Medical Exam that Tretola's prognoses for IBS was "stable," *id.* at 1526—on appeal, approved Tretola's disability application on the basis of severe impairment on account of IBS (and also fibromyalgia). *Id.* at 1457.[20]  And Dr. Jones, in an August 22, 2012 statement, stated that Tretola's IBS resulted in:

> debilitating abdominal pain, frequent constipation, cramping. She has chronic symptoms as well as intermittent flares, which make it difficult to eat and result in weight loss. The symptoms have been more or less unchanged since I assumed her care in 2010. Several different treatment trials have not successfully managed her symptoms.

*Id.* at 3268.  This is the evidence on which Tretola relies in claiming disability, as of February 14, 2012, due to IBS.

---

[20] Although the SSA's determination is not binding upon this Court, the Court may consider the SSA's findings as "some evidence of total disability." *Paese v. Hartford Life & Accident Ins. Co.*, 449 F.3d 435, 442 (2d Cir. 2006); *see also Pagan v. Nynex Pension Plan,* 846 F. Supp. 19, 21 (S.D.N.Y.1994) ("Social Security determinations are [ ] not binding on ERISA plans.").

First Unum, for its part, relies on other evidence.  First Unum argues that Tretola's clinical records do not support a finding that Tretola's IBS caused her to be unable to do her job. First Unum Br. 22.  On July 2, 2009, Dr. Purow noted that Tretola's IBS was "doing really <u>well</u>." AR 806 (emphasis in original).  In an August 14, 2009 report for Tretola's short-term disability benefits, Dr. Purow concluded that Tretola could return to work on June 24, 2009.  *Id.* at 292. On May 10, 2010, Dr. Purow and Dr. Burns, Tretola's then-primary care physician, both noted an improvement in Tretola's IBS:  Dr. Purow observed that her IBS was "now just diet-controlled," and that "[s]he overall has been doing really well," *id.* at 877; and Dr. Burns also reported that Tretola's "IBS symptoms [had] improved lately," *id.* at 886.

Further, First Unum notes, by October 2010, Tretola began visiting Dr. Jones as her primary care physician; on October 29, 2010, Tretola reported "better" IBS symptoms to Dr. Jones.  *Id.* at 1195.  And although Tretola reported constipation in October 2010, *id.*, by November 18, 2011, she had gained weight and no longer had "explosive diarrhea," *id.* at 2940. Dr. Diez, in his IME, concluded that Tretola's IBS had been a "diagnosis of exclusion" and that from reviewing Dr. Purow's records, he did not "feel this condition should prevent [Tretola] from performing her job."  *Id.* at 3050.  Dr. Schnars also observed that Tretola's medical records had "little comment of [gastrointestinal] symptoms in treatment records from 1/12 onward."  *Id.* at 3540.

Considering this evidence from the administrative record as a whole, the weight of the evidence appears to support First Unum's determination that Tretola was no longer disabled by IBS as of the time First Unum terminated her long-term disability benefits.  But the evidence is not conclusive.  Dr. Jones' August 22, 2012 statement in support of Tretola's appeal of First Unum's termination decision does support Tretola.  Regrettably, as with Tretola's fibromyalgia

condition, Tretola's counsel's refusal to submit Dr. Jones' updated medical records to First Unum has deprived the Court of the ability to assess concretely how Dr. Jones made his determination that Tretola continued to be disabled by IBS, as of February 14, 2012.  It is possible that Dr. Jones lacked any reliable basis on which to arrive at that conclusion; it is possible that he had such a basis—for example, a recent examination he had conducted of her or records of such a recent examination by another physician.  The Court is loathe to, and does not, reject Tretola's position as to this ailment, given the possibility that Dr. Jones' 2012 assessment in her favor had a sound foundation.

Accordingly, the Court denies both parties' motions for summary judgment as to IBS.  As with fibromyalgia, it appears that there is a genuine dispute of material fact as to whether or not Tretola was disabled by IBS as of February 14, 2012, such that a reasonable factfinder could find for either side.  Trial on this issue will be needed as well.  Again, to enable the Court to determine at trial the weight that is properly assigned to the testimony and assessments of the witnesses on the IBS issue, the Court will direct plaintiff's counsel, <u>forthwith and in all events no later than two weeks from this decision</u>, to produce to defense counsel and the Court all medical records of plaintiff's treating physicians as of February 14, 2012, which First Unum requested but which were not produced.  Here, too, counsel for each side will be at liberty at trial to offer these records into evidence and examine witnesses about them.

### 3.    Syringomyelia

Syringomyelia is "a rare and progressive degenerating neurological disorder," *Hutton v. Piepgras*, 451 F. Supp. 205, 207 (S.D.N.Y. 1978), "in which a [syrinx] forms within the spinal cord," *Meade v. Astrue*, No. 12 Civ. 2211 (AKH), 2013 WL 8112740, at *1 (S.D.N.Y. Sept. 25,

2013) (citation omitted); *see also Kulakoski*, 210 F. Supp. 2d at 203; *Kernall v. United States*, 558 F. Supp. 280, 281 (E.D.N.Y. 1982) *aff'd*, 729 F.2d 1444 (2d Cir. 1983).

To recap, on January 16, 2002, Dr. Schneider first diagnosed Tretola with syringomyelia, stating that she had a "small syrinx," which caused "some sensory symptoms, a little bit of weakness in the lower extremity." AR 956. Although Dr. Schneider concluded that Tretola should no longer ski, he opined that she could still rollerblade. *Id.* On May 15, 2002, Dr. Schneider noted that Tretola had a "very small syrinx. Her symptoms have resolved almost down to just a mild aching in her back. She looks well." *Id.* at 955.

Both parties agree that Tretola has had a syrinx since age 30 (nine years before she applied for long-term disability benefits). They disagree, however, as to the severity of the condition as of February 14, 2012.

Tretola, attempting to carry her burden of proof, notes that her syrinx had expanded since First Unum deemed Tretola disabled on April 23, 2009. Tretola Br. 10. She compares her October 23, 2008 MRI, which revealed that she had a "small syrinx in the lower thoracic spinal cord," which measured three millimeters by two millimeters, *id.* at 788, with her March 21, 2011 MRI, which revealed that the syrinx was four millimeters by three centimeters. *Id.* On January 13, 2012, Tretola's neurologist, Dr. Callahan, stated, in response to a questionnaire on his prognosis for Tretola's return to employment on a full-time basis, that Tretola's syrinx was "going to be present—lifetime." *Id.* at 2875. On September 18, 2012, First Unum received an undated fibromyalgia questionnaire from Dr. Callahan, in support of Tretola's appeal, which listed syringomyelia as one of his diagnoses. *Id.* at 3334.

First Unum argues, however, that the mere presence of a syrinx is not tantamount to a disabling condition. First Unum explains that on April 23, 2009, when it initially had approved

of Tretola's long-term disability benefits, it did not have diagnostic records regarding Tretola's syrinx.  First Unum Opp. Br. 7.  Indeed, upon receiving and reviewing the records from the Arnold-Chiari Institute, First Unum concluded that Tretola's syrinx was *not* disabling.  *Id.*  In the August 17, 2010 medical review, Dr. Leverett, First Unum's medical consultant, found, based on review of those records, Tretola's syringomyelia to be a "stable and diminutive" condition that "did not rise to a level of impairment.  AR 973.

Tretola's syringomyelia also was never found by the SSA as a disabling condition:  In his December 10, 2009 SSA Internal Medical Exam, Dr. Stefanides found Tretola's syringomyelia prognosis "stable," *id.* at 1526, and ALJ Firestone, in his appeal decision, similarly did not find Tretola to be impaired by the condition, *see id.* 1457.

Further, First Unum notes, the MRIs did not show that Tretola's syringomyelia had worsened.  Although the March 21, 2011 MRI showed that Tretola had a "small syrinx measuring up to 4 mm in short axis dimension and 3 cm in long axis dimension," *id.* at 1678, her April 18, 2011 MRI showed that the syrinx had "no evidence of abnormal intramedullary enhancement," *id.* at 1683.

In addition, Dr. Diez, in his IME, recorded that Tretola admitted that she only suffered from a weakness in her left leg from this condition, and that it was not the medical condition that lead her to leave her job.  *Id.* at 3050.  Dr. Diez also concluded that Tretola's syrinx would not preclude her from performing her job on a full-time basis.  *Id.*  Dr. Schnars, who conducted the physician review of Tretola's medical file, found that Tretola's medical records did not "identify any progression" of the condition.  *Id.* at 3540.

Finally, Tretola's physicians did not, during or close to the relevant period, find that Tretola's syringomyelia was a disabling condition.  On May 10, 2012, Dr. Jones, in support of

Tretola's appeal, merely stated that Tretola had a "stable syringohyrdomyelia on 4/12 MRI." *Id.*
at 3265. Dr. Callahan's undated statement, submitted to First Unum on September 18, 2012, also
did not state that, or why, Tretola's syringomyelia was a disabling condition. *Id.* at 3334. On the
contrary, Dr. Callahan's medical records indicate that Tretola's syringomyelia condition did not
prevent her from working: During an April 26, 2012 visit, Dr. Callahan concluded that Tretola
had a "lot of generalized complaints of pain," but her syringomyelia condition was unchanged.
*Id.* at 3371. He prescribed Depakote to help with her pain. *Id.* On June 27, 2012 visit, Dr.
Callahan evaluated Tretola's syringomyelia as "stable" and "unchanged," and observed that
"[n]otes from NY [did] not show any significant difference than what we have found here." *Id.*
at 3379. On August 27, 2012, Dr. Callahan, after another office visit, stated that Tretola's
syringomyelia was "[u]nchanged." *Id.* at 3383. Although Tretola experienced "mild weakness"
in her left foot, Dr. Callahan concluded that there was "no significant worsening from before"
and that she did not require a brace. *Id.*

Indeed, the only contemporaneous medical record that Tretola cites in support of her
claim to have been disabled by syringomyelia as of February 14, 2012 is Dr. Callahan's January
13, 2012 statement that Tretola's syrinx was "going to be present" for her "lifetime." *Id.* at
2875. But this statement falls short of proving disability; it shows only the durable presence of a
syrinx.[21] And Dr. Callahan's medical records show that, in his opinion, Tretola's syringomyelia

---

[21] Even if Dr. Callahan had opined that her condition was disabling, in determining the weight to
be assigned that assessment, "the Supreme Court has explicitly stated that, unlike the SSA,
ERISA Plan administrators need not give special deference to a claimant's treating physician."
*Paese*, 449 F.3d at 442 (citing *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003)
("[C]ourts have no warrant to require administrators automatically to accord special weight to
the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete
burden of explanation when they credit reliable evidence that conflicts with a treating
physician's evaluation.")).

was an unchanged and stable condition.  Notably, on February 13, 2012, Dr. Callahan, after speaking on the phone with Dr. Leverett, sent a fax to First Unum stating that "an IME [by Dr. Diez] has . . . found that she is able to work—I am deferring to that evaluation and report."  *Id.* at 3100.  Furthermore, on August 27, 2012, Dr. Callahan concluded that that although Tretola's syringomelia caused her mild weakness in her left foot, it was not to the point at which she required a brace.  *Id.* at 3383.  Tellingly, the reports from Tretola's other physicians and First Unum's medical consultants all also concluded that Tretola's syringomyelia was a stable (*i.e.*, non-worsening) condition that did *not* deter her from being at work.

Furthermore, Tretola's statements to doctors effectively abandon a claim of long-term disability based on her syringomyelia.  Tretola has stated that this condition, which she was diagnosed with nine years before she applied for long-term disability benefits, was not the condition that disabled her.  *Id.* at 3050.  There is simply no basis in Tretola's account of her symptoms to view the syringomyelia as having prevented her from returning to work at Cleary. *See Connors v. Conn. Gen. Life Ins. Co.*, 272 F.3d 127, 136 (2d Cir. 2001).

In sum, because none of Tretola's treating physicians, First Unum's medical consultants, or the SSA have opined that Tretola's syringomyelia was disabling, because there is no medical evidence to that effect, because those physicians consistently regarded that condition as stable and not as worsening, and because Tretola's own account of her symptoms belies her assertion that her syringomyelia was disabling, there is no basis on which a reasonable factfinder could find this condition was disabling, as of February 14, 2012.  The Court accordingly grants First Unum's motion for summary judgment, and denies Tretola's motion, on this point.

## CONCLUSION

For the foregoing reasons, the Court (1) denies both parties' motions for summary judgment as to Tretola's IBS and fibromyalgia, (2) grants First Unum's motion for summary judgment as to Tretola's syringomyelia, and denies Tretola's summary judgment as to that condition; and (3) denies, as moot, First Unum's motion to strike Tretola's briefs because of their improper citations to materials outside the administrative record.  The Clerk of Court is directed to terminate the motions pending at docket numbers 64 and 66.

This case will now proceed to a bench trial on the issues left open by this decision.  *See DeFelice*, 112 F.3d at 64–65.

As discussed above, the Court directs Tretola's counsel to produce <u>forthwith, and in all events within two weeks of this decision</u>—*i.e.*, by February 20, 2015—to First Unum and the Court, <u>all</u> outstanding medical records that First Unum requested prior to or during Tretola's appeal of First Unum's decision to terminate Tretola's long-term disability benefits, but which were not produced.  (For avoidance of doubt, these records are limited to records that existed as of the time of First Unum's request for such materials.)   These may be produced pursuant to a confidentiality order.  Counsel for Tretola is advised that the deadline in this paragraph will not be extended.

The Court further directs the parties to appear for a conference on March 11, 2015, at 11 a.m.  At that conference, the Court will set a trial date and deadlines for the various pretrial submissions called for by the Court's individual rules.  *See* http://www.nysd.uscourts.gov/judge/Engelmayer.  Counsel are advised that trial likely will be held in June or July 2015.

The Court further directs that, by February 27, 2015, lead counsel for Tretola and First Unum meet and confer to discuss the upcoming trial in detail, with the goal of identifying the

witnesses that each party intends to call at trial, the substance and the anticipated length of each witnesses' testimony, any anticipated pretrial motions, and any other issues that may require pretrial resolution.[22] By Tuesday, March 3, 2015, counsel are to submit a joint letter to the Court, reporting on these matters.

SO ORDERED.

*Paul A. Engelmayer*

Paul A. Engelmayer
United States District Judge

Dated: February 6, 2015
       New York, New York

---

[22] The parties have submitted conflicting opinions from vocational experts (Leopold and Maxcy) as to the physical requirements of Tretola's position as a senior purchasing specialist at Cleary. The dispute appears to be over whether Tretola's occupation required "frequent" walking and standing (Tretola's position) or "occasional" walking and standing (First Unum's). It is not clear to the Court whether this dispute is material, particularly with Tretola's syringomyelia condition having been eliminated as an issue in the case. Counsel are to discuss this issue when they meet and to alert the Court, in their letter, whether counsel have reached agreement on the relevant facts, and if not, what testimony counsel believe the Court should receive on this point at trial.